UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                       :
ARCH INSURANCE COMPANY,                :
                                       :
                    Plaintiff,         :
                                       :
          -v-                          :
                                       :
HARLEYSVILLE WORCESTER INSURANCE       :
COMPANY and ILLINOIS UNION INSURANCE   :      13 Civ. 7350 (DLC)
COMPANY,                               :
                    Defendants.        :      <u>OPINION & ORDER</u>
                                       :
---------------------------------------X
                                       :
HARLEYSVILLE WORCESTER INSURANCE       :
COMPANY,                               :
                                       :
          Third-Party Plaintiff,       :
                                       :
          -v-                          :
                                       :
ERIE PAINTING AND MAINTENANCE, INC.,   :
                                       :
          Third-Party Defendant.       :
                                       :
---------------------------------------X

APPERANCES:

<u>For Plaintiff Arch Insurance Company</u>

Diane K. Kanca
Edward G. Warren
Voute Lohrfink Magro & McAndrew, LLP
170 Hamilton Avenue
White Plains, NY 10601

<u>For Defendant Illinois Union Insurance Company</u>

Ryan K. Cummings
Hodgson Russ, LLP
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY 14202

1

For Defendant Harleysville Worcester Insurance Company

Lance J. Kalik
Tracey K. Wishert
Riker Danzig Scherer Hyland & Perretti, LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962


DENISE COTE, District Judge:

Plaintiff Arch Insurance Company ("Arch") brings a declaratory judgment action against Illinois Union Insurance Company ("Illinois Union"), and Harleysville Worcester Insurance Company ("Harleysville") (collectively, "Defendants"), seeking indemnification for payments Arch made to settle a claim for personal injuries brought by Enio Antonio Rodrigues ("Rodrigues"), an employee of the Defendants' insured, Erie Painting & Maintenance, Inc. ("Erie Painting"), against Arch's insured, the New York State Thruway Authority ("Authority") ("Rodrigues Incident").  Rodrigues sustained injuries when he fell from a trailer while performing work under a contract between Erie Painting and the Authority.  Illinois Union has moved to dismiss Arch's Second Amended Complaint ("SAC").  For the following reasons, the motion is granted.

BACKGROUND

The following facts are uncontroverted or taken in the light most favorable to Arch.  Erie Painting contracted with

2

the Authority to perform painting work.  Among other things,
Erie Painting's contract with the Authority required Erie
Painting to defend and indemnify the Authority for any
accident or injuries arising out of work performed.  See <u>New
York State Thruway Authority v. Erie Painting and
Maintenance, Inc.</u>, No. 27722/11 (Sup. Ct. June 17, 2013)
("Supreme Court Indemnity Opinion").

   At the time of the Rodrigues Incident, the Authority was
insured by Arch under a New York Owners and Contractors
Protective Liability Policy (the "Arch OCPL Policy").  The Arch
OCPL Policy was procured for the Authority's benefit by Erie
Painting pursuant to a requirement in Erie Painting's contract
with the Authority.  The policy provides coverage for a one-year
term, from April 4, 2008 through April 4, 2009.  It also provides
that the "Location of Covered Operations" is "route 8, 10, 12, 28
& 30 Hamilton & Oneida Counties, NY," and the "Description of
Operations" is "Painting 18 bridges."  It further provides that
Arch would pay a premium of $5,250 in exchange for an aggregate
coverage limit of $2,000,000.  And it identified as the
"Designated Contractor" "Erie Painting & Maintenance."

   The Arch OCPL Policy provided for coverage for bodily injury
as follows:

   <u>We will pay those sums that the insured</u> [i.e., the
   Authority] <u>becomes legally obligated to pay</u> as
   damages because of "bodily injury" or "property
   damage" to which this insurance applies.  We will
   have the right and duty to defend the insured

3

against any "suit" seeking those damages . . . .
This insurance applies to "bodily injury" and
"property damage" only if (1) The "bodily injury"
and "property damage" is caused by an "occurrence"
that takes place in the "coverage territory" and
arises out of (a) Operations performed for you by
the "contractor" named in the Declarations under
the designated contract, including your general
supervision of these operations; or (b) The
existence of any condition in any portion of a
state highway included under the designated
contract with the "contractor" named in the
declarations.

(Emphasis supplied.)

The Arch OCPL Policy also contains an "Other Insurance"

clause, which addresses the policy's relationship with Erie

Painting's other insurers.  The "Other Insurance" clause

provides that its coverage is "primary," and that Arch will

not seek contribution from Erie Painting's insurers.  The

clause reads in relevant part:

The insurance afforded by this policy is primary
insurance and we will not seek contribution from
any other insurance available to you except if the
other insurance is provided by a contractor other
than the designed "contractor" for the same
operation and job location designated in the
Declarations.

If the other insurance is available, we will share
with that other insurance by the method described
below.  If all of the other insurance permits
contribution by equal shares, we will follow this
method also . . . .  If any of the other insurance
does not permit contribution by equal shares, we
will contribute by limits.

(Emphasis supplied.)

The second relevant policy in place at the time of the

Rodrigues Incident is a Commercial General Liability policy issued by Illinois Union to Erie Painting ("Illinois Union CGL Policy").  The policy period associated with that policy ran from September 1, 2009 through September 1, 2010.  The Illinois Union CGL Policy provides for two million dollars of general liability insurance to Erie Painting including, "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury.'"  The Illinois Union CGL policy carried a $70,388 premium.  Unlike the Arch OCPL Policy, the Illinois Union CGL policy is not expressly restricted in scope to risks arising out of any particular Erie Painting contract.

The Illinois Union CGL Policy contains an "auto" exclusion provision, which provides that "[t]his insurance does not apply to . . . [b]odily injury or property damage arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft owned or operated by or rented or loaned to any insured.  Use includes operation and 'loading or unloading.'"  (Emphasis supplied.)  "Auto" is defined in the Illinois Union CGL Policy as "a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment.  But 'auto' does not include 'mobile equipment.'"  (Emphasis supplied.)

The third relevant policy in place at the time of the Rodrigues Incident was a Commercial Automobile Policy issued by

Harleysville to Erie Painting (the "Harleysville CAP").  The
Harleysville CAP covers risks arising out of the use of an
"auto."  The Harleysville policy provides as follows:

> We will pay all sums an "insured" legally must pay
> as damages because of "bodily injury" or "property
> damage" to which this insurance applies, caused by
> an "accident" and resulting from the ownership,
> maintenance, or use of a covered "auto."

The policy covered the period from September 1, 2008 through
September 1, 2010.  It also contains a "mobile equipment"
exclusion.  The Harleysville CAP defines "mobile equipment," with
certain exceptions, as "[v]ehicles . . . maintained primarily for
purposes other than the transportation of persons or cargo."

Erie Painting was required to name the Authority as an
additional insured on both of its liability policies.  On
November 18, 2009, Rodrigues was working for Erie Painting
painting bridges along a New York highway when he fell off of a
trailer.[1]

Following the Rodrigues Incident, Rodrigues sued the
Authority in the New York Court of Claims seeking damages for his
injuries ("Underlying Action").  Both of Erie Painting's
insurers, Illinois Union and Harleysville, disclaimed coverage
and did not provide a defense or indemnification because of their
application of certain exclusions in their respective policies to
the trailer from which Rodrigues fell.  Illinois Union claimed

---

[1] The trailer is not described in the SAC, but Arch contends that
it was being used as a "work platform" at the time of the

that the trailer constituted an "auto," and disclaimed coverage
on the basis of the "auto" exclusion in its policy.
Harleysville, on the other hand, stated that the trailer was not
an "auto" (which would have triggered its coverage obligation),
but instead a piece of "mobile equipment," and on March 22, 2010,
disclaimed coverage on the basis of the Harleysville CAP "mobile
equipment" exclusion.

Arch tendered a defense to the Authority, and ultimately
paid $500,000 in 2013.  Arch now contends that the trailer is
properly characterized as either a "work platform," in which case
the Illinois Union CGL Policy would apply, or an "auto," in which
case the Harleysville CAP would apply.

Arch filed this action on October 18, 2013, and filed the
SAC on March 17, 2014.  Illinois Union moved to dismiss the SAC
on March 28.  Arch has opposed the motion and Harleysville has
opposed it in part.  Harleysville opposes Illinois Union's
contention that the "auto" exclusion in the Illinois Union CGL
Policy applies to the trailer in the Rodrigues Incident, but
joins Illinois Union's argument that Arch has waived any right to
seek contribution from Erie Painting's insurers.  Harleysville
contends that success on that argument would result in the
dismissal of Arch's action against Harleysville as well.
Illinois Union's motion to dismiss was fully submitted on May 9.

---

Rodrigues Incident.

DISCUSSION

When deciding a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor."  LaFaro v. New York Cardiothoracic Group, PLLC, 570 F.3d 471, 475 (2d Cir. 2009).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  A complaint must do more, however, than offer "naked assertions devoid of further factual enhancement." Id. (citation omitted).  A court is "not bound to accept as true a legal conclusion couched as a factual allegation."  Id.

"For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as ... documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) (citation omitted).  The Arch OCPL Policy, the Illinois Union GCL Policy, and the Harleysville CAP were all clearly relied upon by Arch in bringing this action, and the terms of those contracts may

be relied upon to resolve this motion.

Illinois Union also attaches to its motion to dismiss an array of extrinsic documents, including a verified bill of particulars from the Underlying Action, and two excerpts of depositions taken of Rodrigues in connection with the Underlying Action.  These extrinsic materials are not incorporated into the SAC by reference, nor were they relied upon by Arch in commencing this action.  They will not be considered at this stage of the litigation.

In a case grounded in diversity jurisdiction, a federal court "must apply the choice of law analysis of the forum state."  GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc., 449 F.3d 377, 382 (2d Cir. 2006); see generally Erie R. Co. v. Tompkins, 304 U.S. 64, 78-80 (1938).  The parties all assume (and Arch contends) that New York law governs here.  "Under New York choice of law rules . . . where the parties agree that New York law controls, this is sufficient to establish choice of law."  Fed. Ins. Co. v. Am. Home Assurance Co., 639 F.3d 557, 566 (2d Cir. 2011). Such agreement can be implicit.  Id.  Therefore, New York law will be applied.

The standard for interpreting terms in an insurance contract is well settled under New York law:

> When a dispute arises involving the terms of an
> insurance contract, New York insurance law
> provides that an insurance contract is interpreted

to give effect to the intent of the parties as
expressed in the clear language of the contract.
When the provisions are unambiguous and
understandable, courts are to enforce them as
written . . . .

Whether a contract is ambiguous, however, is a
threshold question of law to be determined by
the court.  An ambiguity exists where the terms
of an insurance contract could suggest more than
one meaning when viewed objectively by a
reasonably intelligent person who has examined
the context of the entire integrated agreement
and who is cognizant of the customs, practices,
usages and terminology as generally understood
in the particular trade or business.

Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine

Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006) (citation omitted)


I. Contribution

Illinois Union asserts first that Arch is seeking

contribution from the Defendants despite the explicit bar in

the Arch policy.  Arch admits that, because of the terms of

the Arch OCPL Policy, it cannot "seek contribution from

other insurers" of Erie Painting, specifically, Harleysville

and Illinois Union.

"[U]nder New York law, an insurer has a right in equity

to collect a ratable contribution from any other insurer who

is also liable for the same loss."  Int'l Multifoods Corp.

v. Commercial Union Ins. Co., 309 F.3d 76, 89 (2d Cir.

2002).  "[T]here is a well-settled equitable right to

contribution, where there is concurrent insurance, even in

10

the absence of a policy provision for apportionment." U.S.
Fire Ins. Co. v. Fed. Ins. Co., 858 F.2d 882, 885 (2d Cir.
1988) (citation omitted).  Contribution principles apply
when the party seeking restitution shares partial
responsibility for the underlying payment but has paid more
than a proportional share.  "[W]here a party is held liable
at least partially," contribution is "the only available
remedy."  Glaser v. M. Fortunoff of Westbury Corp., 71
N.Y.2d 643, 646 (1988).  "When more than one primary insurer
is potentially obligated to indemnify an insured for a claim
either because of concurrent coverage or because the damage
for which coverage is sought implicates several policy
periods, defense obligations must be apportioned
horizontally among the primary insurers."  Barry R. Ostrager
and Thomas R. Newman, Handbook on Insurance Coverage
Disputes § 6.02 (16th ed. 2013) (hereinafter "Ostrager &
Newman").

        "The rights and obligations of co-insurers depend,
principally, on the specific language of the insurance
contracts."  Id. § 11.01.  Courts look to "the plain
language" of insurance contracts to determine whether
contribution is appropriate.  U.S. Fire Ins., 858 F.2d at
885.  In particular, "[w]here the same risk is covered by
two or more policies, each of which was sold to provide the

11

same level of coverage . . . allocation of coverage . . . among the policies is determined by comparison of their respective 'other insurance' clauses." Sport Rock Int'l, Inc. v. Am. Cas. Co. of Reading, PA, 65 A.D.3d 12, 18 (2009). "[A]n 'other insurance' clause may limit the insurer's liability by providing that, if other insurance is available, all insurers will be responsible for a stated portion of the loss' an 'other insurance' clause of this kind is known as a pro rata clause." Id. (citation omitted).

The terms of the Arch OCPL Policy unambiguously demonstrate that Arch had an obligation to indemnify the Authority for the Rodrigues Incident claim.  As described above, the Arch OCPL Policy provides that Arch "will pay those sums that the insured [i.e., the Authority] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  Arch concedes in its SAC that "Arch was obligated to provide the [Authority] with a defense."  Indeed, no other construction is possible given the terms of the Arch OCPL Policy.  Rodrigues suffered "bodily injury" for which the Authority became "legally obligated to pay" any damages. Arch's coverage obligation was triggered by the Rodrigues Incident.

12

The "Other Insurance" clause of the Arch OCPL Policy confirms that Arch had an obligation to cover damages arising out of the Rodrigues Incident.  First, the "Other Insurance" clause states that "[t]he insurance afforded by this policy is primary insurance."  It is well established that "[p]rimary insurance is coverage that attaches immediately upon the happening of an occurrence that is covered under the terms of the policy."  Ostrager & Newman § 6.03(a).  "'[P]rimary' insurance refers to the first layer of insurance coverage that attaches immediately upon the occurrence of a policy-defined liability or loss."  Ali v. Fed. Ins. Co., 719 F.3d 83, 90 (2d Cir. 2013).  "The word 'primary' is used . . . to distinguish coverage which attaches immediately upon the happening of an occurrence, from excess coverage, which attaches only after a predetermined amount of 'primary' coverage has been exhausted."  Am. Home Assur. Co. v. Republic Ins. Co., 984 F.2d 76, 77 (2d Cir. 1993).  As a result of being a primary insurer, Arch unambiguously had an obligation to defend and indemnify the Authority for Rodrigues Incident.

Finally, Arch's obligation to cover the claims arising out of the Rodrigues Incident is further demonstrated by the provision in its "Other Insurance" clause providing for "pro rata" distribution of payments with other insurers of

13

"contractor[s] other than the designated 'contractor.'"   See generally Ostrager & Newman § 11.02(a) ("Pro rata clauses usually provide that if other insurance exists, the insurer will pay its pro rata share of the loss . . . .").  That clause states that "[if] the other insurance is available . . . [and] permits contribution by equal shares, we will follow this method also."  Since Erie Painting was the designated contractor, this provision of the policy does not permit Arch to seek pro rata distribution of payments in this case.  But, the existence of this clause further confirms that Arch's policy contemplated that Arch would make payments to the Authority in the first instance.

In sum, the terms of the Arch OCPL Policy unambiguously demonstrate that Arch may not seek contribution from the Defendants for its payment to the Authority in connection with the Rodrigues Incident.  The policy establishes both that Arch was a primary insurer for the Authority for this accident and that it could not seek contribution from other insurers for an injury to an Erie Painting employee.

II.   Indemnification

Arch concedes it cannot seek contribution from the Defendants, but asserts that it is entitled to indemnification.  Arch argues that its policy was part of a

14

"belt-and-suspenders" approach to coverage, in which its policy functioned as "last resort" coverage in the event that Erie Painting's insurers were unable or refused to provide coverage for a claim arising out of Erie Painting's work.  Arch does not rely on insurance contract language for this proposition.  Arch relies instead on the disparity in premiums charged for its policy ($5,250) and Illinois Union's policy ($70,388).  Arch contends that, given this disparity, equity requires it to be fully indemnified by Illinois Union and/or Harleysville for its payment in connection with the Rodrigues Incident.

The principle of equitable indemnification, also known as common-law indemnification, allows a non-culpable party who has been compelled to make a payment "to shift the entire burden" to the liable party and obtain full reimbursement.  <u>Frank v. Meadowlakes Dev. Corp.</u>, 6 N.Y.3d 687, 691 (2006) (citation omitted).  The New York Court of Appeals has explained the distinction between contribution and indemnification in the tort context:

> In the classic indemnification case, the one seeking indemnity <u>had committed no wrong</u>, but by virtue of some relationship with the tort-feasor or obligation imposed by law, was nevertheless held liable to the injured party.  In other words, where one is held liable solely on account of the negligence of another, indemnification, not contribution, principles apply to shift the entire liability to the one who was negligent. Conversely, where a party <u>is held liable at least partially</u> because of its own negligence,

15

> contribution against other culpable tort-feasors
> is the only available remedy.

Glaser, 71 N.Y.2d 643 at 646 (citation omitted) (emphasis supplied).  Courts in other jurisdictions have applied the equitable indemnification doctrine in the insurance context. See, e.g., Grinnell Mut. Reinsurance Co. v. Ctr. Mut. Ins. Co., 658 N.W.2d 363, 378 (2003) (applying North Dakota law). The touchstone of an indemnification action is the absence of any responsibility to pay on the part of the party seeking indemnification.  See, e.g., Glaser, 71 N.Y.2d at 646.  Where one is held "at least partially" responsible for a payment, the doctrine of contribution applies instead. Id.

Arch does not dispute that its indemnification claim lies only when "an insurer covers a loss it was not obligated to cover."  But, as explained above, the Arch OCPL Policy made it a primary insurer for the Authority and required it to provide insurance for the Rodrigues Incident. Arch cannot rewrite the unambiguous terms of its policy through reliance on extrinsic evidence.  "When the provisions are unambiguous and understandable, courts are to enforce them as written."  Parks Real Estate Purchasing Grp., 472 F.3d at 42.  Thus, the doctrine of indemnification is unavailable to Arch.

Arch's reliance on the disparity of the premiums to

escape the consequences of its obligation to provide
insurance coverage to the Authority fails.  Under New York
law, "premium size may be an important factor in determining
priority of coverage."  U.S. Fire Ins., 858 F.2d at 885.
Even in those circumstances, however, it is only a component
of the analysis.  The analysis must also consider "whether
premium disparity instead reflects disparities in the degree
of risk covered."  Id.  "In evaluating the significance of
the amount of the premium, it is clearly important to
measure that premium against the . . . coverage provided by
that policy."  Northbrook Excess & Surplus Ins. Co. v. Chubb
Grp. of Ins. Companies, 496 N.Y.S.2d 430, 433 (1st Dept.
1985).  As noted above, the policies at issue here provided
different coverage.

In any event, while priority of coverage may be an
important component of any contribution calculation, Arch is
not entitled to contribution.  Given Arch's unambiguous duty
to provide insurance coverage to the Authority, its request
for indemnification fails.  Any disparity in premium amounts
cannot salvage the claim for indemnification.


CONCLUSION

The Defendants' March 28, 2014 motion to dismiss Arch's
Second Amended Complaint is granted.  A scheduling order

17

will address the remaining claims in the case.


        SO ORDERED:


Dated:     New York, New York
           July 7, 2014

                              _____
                                    DENISE COTE
                          United States District Judge